The **COMMERCIAL NATIONAL BANK OF BEEVILLE, Appellant,**

v.

**Kenneth L. BATCHELOR, Appellee.**

No. 13–96–387–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1998.

Opinion Overruling Rehearing Nov. 5, 1998.

George H. Spencer, Jr., Brett E. Dunn, Clemens & Spencer, Michael B. Clark, San Antonio, for Appellant.

Carl R. Teague, Attorney at Law, Robert John Myers, Attorney At Law, R.H. Tibaut Bowman, Attorney At Law, San Antonio, for Appellee.

Before the court en banc.[1]

1. Retired Justice Noah Kennedy assigned to this Court by the Chief Justice of the Supreme Court

**OPINION**

DORSEY, Justice.

This is a suit by the Commercial National Bank of Beeville on the deficiency owed on promissory notes by Kenneth L. Batchelor. By two points of error, the bank challenges the legal and factual sufficiency of the evidence to support the take-nothing judgment rendered against it. We reverse and render judgment for the bank.

The trial court submitted one special question to the jury, which was whether the bank had failed to comply with the agreements (promissory notes) by failing to enforce the notes in good faith. The jury answered in the affirmative, and Batchelor's recovery is based on the jury's answer to this issue. Therefore, we review the facts of the case to determine if the evidence is sufficient to support the verdict.

In 1985, Batchelor borrowed $1,450,000 from the bank in order to buy a car dealership in Beeville, Texas. The purchase included the pre-existing and ongoing business as well as the improved real property where the business was located. The realty property was assigned to the bank as collateral on the loan. Batchelor's car dealership failed, and Dave Moore bought the business only. The bank approved the sale, and Moore then leased the property from Batchelor. The loan was refinanced, and the lease was added as collateral. Moore's monthly lease payment was $6,000, while the payment on the refinanced loan was $9,088 per month.

In 1991, Batchelor experienced some personal financial problems. This led to a second refinancing of the loan in early 1992, and the monthly payments were reduced to approximately $8,000. As his financial status remained unsteady in early 1993, Batchelor sought a third restructuring of the loan to lower the payments to $6,000 per month, which Moore paid in rent. The bank refused to restructure the loan a third time. After February 1993, Batchelor began remitting to the bank only the amount of the lease payments. As of April 1993, Batchelor had paid

of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988); Tex.R.App. P. 41.2(b).

a total of $1,600,000 in principal and interest on the loan.

In April, the bank notified Batchelor he was in default because the entire monthly payment was not being remitted. He was given until May 21, 1993 to bring the loan current, otherwise the bank intended to accelerate the payments. The bank also indicated if Batchelor was unable to satisfy the accelerated notes, the collateral would be sold and the money received would be applied to the debt, but that he would remain liable for any deficiency. Batchelor did not bring the loans current by the deadline. He offered to deed the property to the bank in exchange for cancellation of the debt, but the bank refused. However, the bank suggested Batchelor sell the property to the tenant Moore, who eventually paid $440,000 for it. In July 1993, while the sale was pending, Batchelor did not make his loan payment. After the sale was finalized, the money was credited to Batchelor's debt with the bank, but a deficiency resulted.

In September 1993, the bank sued Batchelor, alleging he owed it approximately $154,-000. It sought pre- and post-judgment interest, attorney's fees, and costs. Batchelor responded with an affirmative defense and a counterclaim, each alleging the bank failed to enforce the promissory notes in good faith in accordance with section 1.203 of the Texas Business & Commerce Code. The material facts were stipulated before trial: the bank was entitled to recover under Note 9004 and Note 9005 the combined principal of $154,-286.10, the accrued interest on both notes after default until October 31, 1995, was $64,-749.43, with interest accruing at $76.08 per day from that date; the bank's reasonable attorney's fees; and the appropriate post-judgment interest rate. However, the jury found that the bank had not enforced the promissory notes in good faith, and, based on that finding, a take-nothing judgment was rendered against it.

■ By two points of error, the bank challenges the legal and factual sufficiency of the evidence to support the jury verdict that it did not act in good faith. The bank preserved its legal sufficiency challenge by moving to disregard the jury's answer, for judg-ment n. o. v., and for new trial. *See* TEX. R.APP. P. 33.1; *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992); *Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.*, 927 S.W.2d 146, 148–49 (Tex.App.—Corpus Christi 1996, no writ).

■ When reviewing a no evidence point we consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985); *International Armament Corp. v. King*, 686 S.W.2d 595, 597 (Tex.1985); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If any evidence of probative force exists to support the jury's finding we must overrule the point and uphold the finding. *In re King's Estate*, 244 S.W.2d at 661–62.

■ When reviewing a factual sufficiency point we must weigh all of the evidence in the record. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). A court may overturn findings only if they are so against the great weight and preponderance of the evidence that they are clearly wrong and unjust. *Ortiz*, 917 S.W.2d at 772; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). In *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986), the court said a court of appeals must also "clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust." *Pool*, 715 S.W.2d at 635.

The jury was asked one question and was given the following instructions relative to that question:

### QUESTION NO. 1

Did the Commercial National Bank of Beeville fail to comply with the agreements?

In addition to the language of the agreements (promissory notes), the law imposes on a party to an agreement an obligation to enforce the agreement in good faith. In that connection, good faith means honesty in fact in the conduct or transaction concerned.

## INSTRUCTION

In addition to the language of the agreements (Promissory Notes 9004 and 9005), the law imposes on a party to an agreement an obligation to enforce the agreement in good faith. In that connection, good faith means honesty in fact in the conduct or transaction concerned. Honesty in fact is determined by the actual belief of the party in question, not the reasonableness of that belief.

The jury answered "yes" to the question, and a take nothing judgment against the bank followed over its objections. Now the bank challenges the legal sufficiency of the evidence to support that answer.

■ The basis of Bachelor's defense is section 1.203 of the Texas Business & Commerce Code, which states the general rule that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." TEX. BUS. & COM.CODE ANN. § 1.203 (Vernon 1994). The commentary to that section states: "this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power." Therefore, to talk in terms of violating the duty of good faith of the business and commerce code, one must first identify the particular provision of the contract that was not enforced in good faith. "In the absence of a specific duty or obligation to which the good faith standard could be tied, section 1.203 will not support [a] claim for damages." *Northern Natural Gas Co. v. Conoco, Inc.*, 41 Tex. Sup.Ct. J. 659, 1998 WL 178591, at *3 (Tex. April 14, 1998); *Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 482 (Tex.App.—Corpus Christi 1989, writ denied).

■ There is no evidence the bank failed to comply with its obligations under the promissory notes. Appellee argues here, as he did below, that the bank's dealings in its failure to renew, extend, and lower the payment amounts under the notes somehow violated its obligation to enforce the notes in good faith.

There is nothing in the notes imposing a duty on the bank to renegotiate or renew them on more favorable terms to the debtor. That the bank refused to renegotiate or renew the notes could not be a breach of its duty to perform in good faith. There is no dispute that Batchelor was in default. The bank could look to whatever legal remedies it had, including a foreclosure sale and suit for the deficiency, if any. The bank's previous acts of lenience with Batchelor do not impose any obligation to continue such extra-contractual lenience in the future based on the U.C.C.'s good-faith provision.

■ Batchelor complains of the conduct of Greg Woo, his loan officer, in the handling of the sale to Moore as the bank's failure to act in good faith. Woo was the officer of the bank dealing with both Batchelor and Moore, and he suggested the property be sold to Moore, or it would be foreclosed upon and posted for sale. Although Woo had an appraisal of the property, he did not disclose the property's indicated value to Batchelor. To effect the sale, Moore borrowed money from the bank and bought the property for exactly the appraised value.

None of these facts support the conclusion that the bank and Woo did not act in good faith.

The contract did not establish any duty for appellant to disclose its private appraisals to appellee, and it did not create any fiduciary duty between appellant's employees and appellee. Woo was not acting as the agent of either party, Moore or Batchelor, and they negotiated the price between them. Our case is governed by the good-faith definition of section 1.201(19), which is defined as honesty in fact. TEX. BUS. & COM.CODE ANN. § 1.201(19) (Vernon 1987). Here, lack of good faith exists when a party has actual knowledge of facts that when acted on constitute a dishonest disregard of the contractual rights of another party. *Citizens Bridge Co. v. Guerra*, 152 Tex. 361, 258 S.W.2d 64, 69–70 (1953); *Wilson v. O'Connor*, 555 S.W.2d 776, 780–81 (Tex.Civ.App.—Dallas 1977, writ dism'd). Because disregard of a contractual right is an element of the test, appellee must point to some provision in the contract in

order to satisfy the test. Appellee relies on no provision in the contract, but instead claims that Woo's actions as a middle man violated an implied duty established by general standards in the banking industry. There is no authority stating the conduct of other parties engaged in the same line of business has any bearing on the section 1.201(19) definition, as section 1.201(19) defines good faith in purely subjective terms; that is, what Woo knew. Krahmer, 12 Texas Practice § 24.15 (2d ed.). The case law is clear that neither negligence nor a reasonable person standard are the same thing as bad faith. *Citizens Bridge*, 258 S.W.2d at 69–70; *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984).

Appellee points to no specific provision of the notes that the bank is claimed to have not used good faith in enforcing. What some might consider to be cold-heartedness by the bank in not renewing or restructuring debt is not the equivalent of the absence of good faith. Because of the absence of any particular provision of the contract that the bank can be said to have enforced in "bad faith," the defense does not apply. A jury may not restructure or recast promissory notes or other contracts to satisfy their sense of justice contrary to the written agreement of the parties.

We hold there is no evidence to support the jury's verdict.

We reverse and render the judgment for the bank in the sums stipulated.

Dissenting opinion by YANEZ, J., joined by HINOJOSA and RODRIGUEZ, JJ.

YANEZ, Justice, dissenting.

Because the majority holds the evidence is legally insufficient to support the jury's verdict, I respectfully dissent. I would instead find the evidence is legally sufficient but factually insufficient to support the verdict. For that reason, I would reverse and remand for new trial.

## STANDARDS OF REVIEW

When we review a legal sufficiency of the evidence point of error, we consider only the evidence and reasonable inferences that tend to support the jury's finding, and we disregard all evidence and inferences to the contrary. *Responsive Terminal Sys. Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex. 1989). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987).

When we review a factual sufficiency point of error, we consider, weigh, and examine all of the evidence which supports or undermines the jury's finding. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only when we find that the evidence, standing alone, is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

The Texas Business and Commerce Code imposes an obligation of good faith on the enforcement of every commercial contract. TEX. BUS. & COM.CODE ANN. § 1.203 (Vernon 1994). Good faith is defined as "honesty in fact in the conduct or transaction concerned." TEX. BUS. & COM.CODE ANN. § 1.201(19) (Vernon 1994). Honesty in fact is determined by the actual belief of the party in question and not the reasonableness of that belief. *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex.1984). Conduct which is honest in fact will be free of improper motive or wilful ignorance of the facts at hand. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 1998 Tex. LEXIS 27, at * 29 (Tex.1998).

Failure to act in good faith is not a basis for an independent cause of action. *Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 482 (Tex.App.—Corpus Christi 1989, writ denied). An alleged breach of the duty of good faith as imposed by the business and commerce code gives rise to a breach of contract claim. *Hallmark v. Hand*, 885 S.W.2d 471, 480 (Tex.App.—El Paso 1994, writ denied); *Adolph Coors Co.*, 780 S.W.2d at 482. The agreement made by the parties and embodied in the contract itself cannot be varied by

an implied covenant of good faith and fair dealing. *Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944, 947 (Tex.1984); *Adolph Coors, Co.*, 780 S.W.2d at 482.

## APPLICATION

Batchelor's pleadings and appeal briefs do not link the purported acts of bad faith to specific provisions of the promissory notes that were allegedly breached by CNB. However, he does contend CNB failed to act in good faith when it refused to renew and extend the secured notes for a reasonable time and refused to charge an interest rate that would have allowed him to maintain the real estate at issue. The jury was asked to consider the following question and instruction in reaching a verdict:

> Did the Commercial National Bank of Beeville fail to comply with the agreement?

INSTRUCTION

> In addition to the language of the agreements (Promissory Notes 9004 and 9005), the law imposes on a party to an agreement an obligation to enforce the agreement in good faith. In that connection, good faith means honesty in fact in the conduct or transaction concerned. Honesty in fact is determined by the actual belief of the party in question, not the reasonableness of that belief.

Thus, the record is reviewed for evidence that CNB by its alleged conduct failed to act in good faith, *i.e.,* to exhibit honesty in fact in its dealings with Batchelor, thereby preventing the loan restructure.

Batchelor presented evidence showing that by April 1993, he had paid 1.6 million dollars in principal and interest on the loan. He was considered a good customer, and prior lending officers had worked with him to meet his financial needs. At the time of the request in issue, Batchelor claimed an ability to pay only $6,000 dollars of an $8,000 monthly payment. A new loan officer for CNB, Greg Woo was assigned to replace the former employee who had handled Batchelor's two previous restructure requests. Batchelor's testimony portrayed Woo as unwilling to consider Batchelor's financial problems in spite of his good credit record.

In early 1993, Batchelor requested through Woo a third restructuring of his loan to extend the payment term, to reduce the interest rate, or both. Woo subsequently refused the request on behalf of CNB without presenting the request to the bank loan committee. The two previous restructure requests had been granted after presentations to the committee. Batchelor contends this shows a lack of good faith.

Evidence of CNB's policy in determining problem loans was presented. Woo testified Batchelor met one criteria of a problem loan; he was behind in his payments. Testimony reflected, however, that Batchelor was only about half a month late with the full $8,000 payment at the time Woo refused to present the loan restructure request to the loan committee. When Batchelor requested assistance, he had already made a $6,000 payment.

Other evidence indicates that, as Batchelor continued to be in default in May 1993, Woo suggested the property at issue be sold to Moore, or it would be foreclosed upon and posted for sale. Moore was also a customer of CNB and in particular of Woo. There was testimony reflecting that Woo's representation of both the buyer and the seller in a particular transaction was not good banking policy and could be viewed as a conflict of interest. Although Woo knew the appraised fair market value of the property, he would not provide this information to Batchelor. Remarkably, Moore purchased the property for exactly the appraised value. I would hold this evidence is legally sufficient to support a jury finding that CNB through Woo failed to act in good faith in its dealings with Batchelor and thus deprived him of the benefits of the agreement. I would overrule CNB's first point of error.

After reviewing the remainder of the evidence, I would find it factually insufficient to support the jury's finding. There is no indication of bank policies or procedures that prohibited Woo from determining the legitimacy of the request without involving the loan committee. In any event, the request was denied after Woo discussed the matter with his immediate supervisors. Woo explained that his primary responsibility was to

protect the bank's interests. Woo was familiar with Batchelor's file at the time of the request. The file indicates: (a) the loan had last been restructured in early 1992; (b) the current appraised value of the collateral property was *less* than the outstanding value of the loan; (c) the lease interest was also collateral for the loan; (d) $6,000 of the $8,000 payment came from the lease to Moore; (e) Batchelor wanted the loan restructured to equal the $6,000 rent payment; (f) Batchelor claimed he was having difficulty paying the $2,000 difference; (g) the $6,000 lease payment exceeded the market value for rent on the property by approximately $1,500; (h) the lease expired in February 1993, the time when the restructure was sought; and (i) negotiations were under way for a new lease contract with lease payments likely to be reduced.

Such evidence raised valid concerns about whether restructuring the loan was in the best interest of the bank. Restructuring the notes to equal the lease payment, when that payment was likely to be reduced by a new lease contract, would not relieve Batchelor of the burden to pay the difference for which he was now claiming an inability to satisfy. This evidence is overwhelmingly against a finding of wilful disregard of facts or improper motive on the part of CNB or Woo.

Batchelor argues that CNB failed to act in good faith by allowing Woo to reverse its past policies of renewing and extending the loans. However, evidence of the bank's prior willingness to restructure the loans does not alter the terms of the contract between Batchelor and CNB. *See Nance v. Resolution Trust Corp.*, 803 S.W.2d 323, 328 (Tex.App.—San Antonio 1990, writ denied). Nor does it establish evidence of dishonesty in fact.

As to CNB's policy regarding problem loans, the portion of the policy in evidence merely instructs lending officers to be familiar with the indicators of problem loans. It does not state how these loans should be handled. Woo admitted he was familiar with the policy. However, there was nothing to indicate Woo portrayed Batchelor's loan as a problem to his supervisors or that if he had, the bank would automatically refuse to restructure the notes.

Batchelor also contends CNB caused him to default on the notes and forced him to sell the property in order to pay off the debt. Batchelor further asserts Woo's bias in favor of Moore during the sale of the property proves a lack of good faith. He claims: (a) Woo suggested selling the property to Moore without revealing that Moore was his bank customer; (b) Woo refused to share with Batchelor an appraisal on the property at issue; (c) Woo did not reveal that the purchase price was the exact amount of the appraisal; and (d) Woo did not reveal to Batchelor that the bank was loaning 100% of the purchase price to Moore.

Batchelor was late with his February 1993 payment. On March 31, 1993, CNB informed Batchelor of his March default and also that he owed $2,250 for an appraisal on the collateral property which he was obligated to provide per his agreement with the bank. On April 19, 1993, CNB notified Batchelor that he continued to be in default and that CNB intended to accelerate the notes if he was not current by May 10, 1993. CNB also indicated that if Batchelor was unable to satisfy the accelerated notes, the collateral would be sold and the money received would be applied to the debt. Batchelor would remain liable for the deficiency, if any. On May 11, the bank again notified Batchelor of his default and extended the payment deadline to May 21. Batchelor failed to bring his loan account current by the deadline.

From March to June 1993, Batchelor remitted as payment the $6,000 derived from the lease payment. Although Batchelor claimed inability to make the additional $2,000 payment each month, he also admitted under oath that the payments were withheld in hope CNB would then restructure the notes. He further admitted a request for restructuring would not excuse him from paying the full loan payment pending the outcome of the request. According to the contract, once Batchelor defaulted on any part of the loan payment, CNB had the right to accelerate the payments and, if needed, sell the collateral.

Instead of posting the property and possibly recovering a lower price, Woo opted to let Batchelor sell the property for appraised market value. In doing this, the bank protected its interests by recovering a greater amount on the outstanding loan, and lessened Batchelor's liability for the deficiency. Woo suggested selling the property to Moore, who initially offered $400,000 for the property.

Batchelor recorded phone conversations between himself and Woo or Moore. These recordings were admitted into evidence. On May 21, Woo called Batchelor to find out how the sale negotiations were progressing. He stated that the deadline for becoming current was up and that he needed an answer on the sale or he would have to post the property. Woo explained that if the property was posted, Moore would likely purchase the property at a better deal. When Batchelor then contacted Moore, the offer was increased to $440,000, which Batchelor accepted with CNB's approval.

By at least May 25, four days after a sale price was agreed to, Batchelor knew from a phone conversation with Woo that Moore was attempting to get a loan from CNB and that Woo was preparing to make a presentation to the loan committee on the matter. Batchelor voiced no concerns at any time about the propriety of Woo's actions. While the evidence may reflect that the better business practice would be for different loan officers to represent each party of the sale, this does not mean either CNB or Woo was dishonest in fact. The same day, Batchelor again learned the bank intended to hold him liable for the deficiency and that because he continued to be obligated for the $2,250 appraisal cost, CNB would not provide him with the appraisal information.

Woo informed Batchelor on June 4 that CNB had approved Moore's loan. According to the record, CNB loaned Moore 100% of the amount needed for the sale. Such a loan did not violate any bank policy or procedure. Although CNB's Real Estate Lending Policy provides that the recommended loan-to-value limit is 85%, the policy does allow for loans in excess of the loan-to-value limit. There is nothing to indicate that CNB lacked a valid reason for extending the loan limit.

I would hold the evidence is factually insufficient to support the jury's verdict that CNB breached the agreement by failing to enforce it in good faith. I would sustain CNB's second point of error, and I would reverse the judgment of the trial court, remanding for new trial.

For these reasons, I respectfully dissent.

Dissenting opinion joined by HINOJOSA and RODRIGUEZ, JJ.

## OPINION ON MOTION
## FOR REHEARING

Kenneth L. Batchelor, appellee, moved for rehearing of our judgment issued August 31, 1998. This motion is overruled. Our judgment reversed the judgment of the district court and rendered judgment in favor of the Commercial National Bank of Beeville in the sums stipulated by the parties. We accordingly render judgment for the Bank as follows:

(1) $154,286.10 as the principal on the promissory notes;

(2) $64,749.43 as interest on the principal through October 31, 1995;

(3) interest accrued from November 1, 1995 through the date of entry of judgment at the rate of $76.08 per day;

(4) $40,000.00 in attorney's fees for trial;

(5) $15,000.00 in attorney's fees for appeal;

(6) post-judgment interest at the rate of 18% on all the foregoing; and

(7) costs of court.