ACCEPTED
03-11-00483-CV
4154370
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/13/2015 7:03:24 PM
JEFFREY D. KYLE
CLERK

**No. 03-11-00483-CV**

**In the Third Court of Appeals
Austin, Texas**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/13/2015 7:03:24 PM
JEFFREY D. KYLE
Clerk

**Trinity Materials, Inc.,**
*Appellant*,

**v.**

**Carroll Sansom, James Sansom, and Robert Coe,**
*Appellees*.

**On Appeal from the 201st District Court
Of Travis County, Texas,
Hon. Honorable Stephen Yelenosky, Presiding**

MOTION FOR REHEARING

Heather B. New
State Bar No. 24007642
Jason P. Steed
State Bar No. 24070671
BELL NUNNALLY & MARTIN, LLP
3232 McKinney Ave.,
Suite 1400
Dallas, Texas 75204
(214)740-1425
(214)740-5725 (fax)
heathern@bellnunnally.com

**Counsel for Appellant, Trinity Materials, Inc.**

1

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ISSUES PRESENTED ..............................................................................................3

ARGUMENT AND AUTHORITIES .............................................................................3

    I.    Because the Landowners elected to treat the lease as continuing
        after Trinity's November 12, 2010 breach, their breach is not excused. .........3

        A.   The Court incorrectly concluded that the post-breach demand for
             royalties was not in the record. .............................................................5

        B.   The Court applied too high a standard for demonstrating
             continued performance.............................................................................7

        C.   Evidence shows that Landowners elected to treat the Lease as
             continuing.................................................................................................12

    II.   Trinity is entitled to offset damages that were conclusively proven
        at trial and that were more than adequately briefed on appeal......................13

        A. Legal sufficiency standards apply even though there was
           no jury finding. .....................................................................................14

        B. Trinity offered ample legal support and demonstrated that it had
           conclusively established damages and fees as a matter of law. ...............16

CONCLUSION AND PRAYER ..................................................................................19

CERTIFICATE OF SERVICE.....................................................................................21

CERTIFICATE OF COMPLIANCE .............................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Cecil v. Smith*,
    804 S.W.2d 509 (Tex.1991). ............................................................................16

*Chung v. Lee*
    193 S.W.3d 729 (Tex. App.—Dallas 2006, pet. denied) ....................................17

*Eco Built, Inc. v. Lulfs*,
    No. 03-08-00427-CV, 2010 WL 3629821
    (Tex. App.—Austin, Sept. 17, 2010, no pet.)...................................... 4, 10, 13, 17

*Gupta v. Eastern Idaho Tumor Inst., Inc.*,
    140 S.W.3d 747 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ..............10

*Hanks v. GAB Business Services, Inc.*,
    644 S.W.2d 707 (1982)..............................................................................7, 17

*Henry v. Masson*,
    333 S.W.3d 825 (Tex. App.—Houston [1st Dist.] 2010, no pet.).........................6

*Lafarge Corp. v. Wolff*, Inc.,
    977 S.W.2d 181 (Tex. App.—Austin 1998, pet. denied)....................................17

*Lofton v. Texas Brine Corp.*,
    777 S.W.2d 384 (Tex. 1989) .........................................................................17

*Long Trusts v. Griffin*,
    222 S.W.3d 412 (Tex. 2006) ........................................................................6, 9

*Man Indus. (India), Ltd. v. Midcontinent Exp. Pipeline, LLC*,
    407 S.W.3d 342, 368 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) .........6

*PopCap Games, Inc. v. MumboJumbo, Inc.*,
    350 S.W.3d 699 (Tex. App.—Dallas 2011, pet. denied) .............. 3, 14, 15, 16, 18

*Ragsdale v. Progressive Voters League*,
    801 S.W.2d 880 (Tex. 1990) ........................................................................18

*Stewart Title Guar. Co. v. Sterling*,
   822 S.W.2d 1 (Tex. 1991) .............................................................. 18, 19

*World Access Telecommunications Grp., Inc. v. Statewide Calling, Inc.*,
   No. 03-05-00173-CV, 2006 WL 2986227
   (Tex. App.—Austin, Oct. 17, 2006, no pet.).........................................................9

## Statutes

TEX. CIV. PRAC. & REM. CODE § 38.001(8)....................................................... 14, 18

TEX. CIV. PRAC. & REM. CODE § 38.003................................................................19

TEX. R. APP. P. 38.1 ...................................................................... 13, 15

INTRODUCTION

By this motion for rehearing, Appellant Trinity Materials, Inc. asks the Court to revisit its decision affirming the trial court's judgment in this who-breached-first dispute. Trinity paid $705,000 in advance royalties to mine sand and gravel on the property of Carroll Sansom, James Sansom, and Robert Coe (the "Landowners") under a 15-year Sand and Gravel Lease, but was thwarted from realizing the benefits of the Lease because the Landowners refused to consent to the various mine plans Trinity proposed. The jury found that the Landowners breached the Lease by withholding consent, but, because the jury found that Trinity breached first, the Landowners were permitted to keep the $705,000 as a windfall for doing nothing but frustrating the purpose of the contract.

The Court found the evidence was legally and factually sufficient to support the jury's finding that Trinity breached based on Trinity's failure to obtain written approval of a mining plan from the Landowners before commencing mining activities on November 12, 2010. (Ex. 1.) Trinity contends there are numerous errors in the Court's conclusions relating to Trinity's breach.[1] But, to narrow the

---

[1] For example, the Lease did not require Trinity to "obtain" written approval, and instead required Trinity only to "submit a mining plan to [the Landowners] for [their] prior written approval, such approval not to be unreasonably withheld." (CR33, App.C at 23.) (¶ 19(h)). The jury's finding that the Landowners breached by unreasonably withholding consent should have absolved Trinity of the obligation, if any, to "obtain" prior written approval. (CR584.)

-1-

issues for consideration, this motion assumes (without agreeing) that Trinity breached on November 12, 2010. Even assuming Trinity's breach, the Court's decision should be reconsidered given the Landowners' continuing performance and Trinity's right to offset damages.

The law requires that the Landowners, being confronted with Trinity's breach, had to elect between continuing or ceasing performance of the Lease. After November 12, 2010, the Landowners demanded royalties under the Lease and demonstrated in numerous letters and court filings (all of which are in the record) that they considered the Lease to be continuing. (CR298-99, 367-68, 784-85; *see* Part I.C.) In light of this election, the jury's answer to Question 3 (prior material breach) is immaterial as a matter of law. The trial court erroneously refused to grant Trinity's post-trial motions pointing out this error. This Court should correct that error by disregarding the who-breached-first question and giving effect to both breach questions, resulting in an offset and recovery of damages that were conclusively established in Trinity's favor and preserved on appeal.

Rehearing is appropriate because the Court's ruling disregards dispositive evidence based on the mistaken belief that evidence was not in the record, misapplies well-established contract and damages law, and overreaches in finding waiver of legal points that were properly preserved post-verdict and on appeal.

-2-

ISSUES PRESENTED

1. Whether the Landowners' election to treat the Lease as continuing should have deprived the Landowners of an excuse based on prior material breach because:

   (a)    the Court refused to consider critical evidence, concluding that it was not in the record when it in fact is; and because

   (b)    the Court erroneously held that the legal requirements for demonstrating continuing performance were not met.

2. Whether Trinity should have been entitled to undisputed offset damages that were conclusively proven at trial because:

   (a)    the Court erroneously found a failure to comply with Rule 38.1, even though Trinity presented over five pages of argument, at least ten citations to legal authority, and a dozen record references; and because

   (b)    the Court failed to conduct the legal sufficiency review under *PopCap Games, Inc. v. MumboJumbo, Inc.*, 350 S.W.3d 699, 710-12 (Tex. App.—Dallas 2011, pet. denied), which applies when there is no jury finding on damages.

ARGUMENT AND AUTHORITIES

I.    **Because the Landowners elected to treat the Lease as continuing after Trinity's November 12, 2010 breach, their breach is not excused.**

When a contracting party commits a material breach, the later-breaching party must elect between two courses of action: either continue performance under the contract or cease performance. *Eco Built, Inc. v. Lulfs*, No. 03-08-00427-CV, 2010 WL 3629821 (Tex. App.—Austin, Sept. 17, 2010, no pet.). The law is clear

-3-

7

that if the later-breaching party elects to treat the contract as continuing and demands performance from the party in default, the previous breach will not excuse nonperformance by the later-breaching party. *Id*.

Here, Trinity demonstrated that the Landowners continued to seek benefits and continued performance under the Lease in numerous ways (examined in Part 1.C., below), culminating in a March 14, 2011 letter demanding that Trinity pay royalties that allegedly had accrued under the Lease—and after trial—on March 1, 2011. (CR 784-85.) Accordingly, the Landowners are precluded from excusing their own breach by relying on the jury's finding of a prior material breach. Instead, the Court should disregard Question 3 and give effect to the Jury's findings that both parties breached, resulting in an offset and a recovery in Trinity's favor.

The Court rejected this argument, because it concluded that, "with one possible exception" (the March 14, 2011 letter), Trinity had not presented enough evidence to show "an affirmative contract-related act required under the contract by the initial non-breaching party to preclude that party from using the defense of prior material breach." But this ruling was legally and factually incorrect.

-4-

**A.** **The Court incorrectly concluded that the Landowners' post-breach demand for royalties was not in the record.**

As an initial matter, the Court was mistaken in its belief that the March 14, 2011 letter was not in the record. (Op. 17-19.) In that letter, the Landowners acknowledged that the jury had already found a breach by Trinity, but nevertheless demanded a royalty payment *that accrued after the February 2011 trial*. (CR3:784-85.) The letter states:

> [A]ccording to the terms of the Lease, Trinity Materials, Inc.'s royalty payment was due and payable to the Lessors on March 1, 2011, but this payment has not been made. . . . If full payment of said royalty is not paid by Lessee to Lessors within the 10-day time period specified in Paragraph 9(a) of the Lease, this shall constitute an additional default under the Lease and the Lessors will terminate the Lease.

(CR785; Ex. 2.) This letter should be sufficient by itself to demonstrate that the Landowners did not terminate the Lease when they learned of Trinity's breach, but instead made a claim for continuing performance by seeking the benefits under the Lease.

The Court correctly recognized the significance of the March 14th letter, but refused to consider it, concluding it was "not a part of the appellate record." (Op. at 10.) The Court was mistaken. The March 14th letter was made a part of the appellate record as an exhibit to Trinity's motion for new trial, and the official CR

version was included as Tab EE in the Appendix to Trinity's opening brief. (CR3:784-85, App.EE at 416-17.)

The Court held that the March 14th letter might "possibly" provide evidence of the Landowners' choice to continue the Lease. The Texas Supreme Court and other courts have held that the mere act of *seeking to benefit* from a contract after the other party's breach is *conclusive evidence* of the initial non-breaching party's choice to treat the contract as continuing. *See, e.g., Long Trusts v. Griffin*, 222 S.W.3d 412, 415-16 (Tex. 2006) (by claiming as damages share of lawsuit recovery, which was benefit of bargain, non-breaching party treated oil and gas operating agreement not as terminated but as continuing and thus "could not cease to share in the expenses and still insist in sharing in the recovery"); *Henry v. Masson*, 333 S.W.3d 825, 841 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Seeking to benefit from the contract after the breach operates as a conclusive choice" depriving the non-breaching party of an excuse for his own non-performance."); *Man Indus. (India), Ltd. v. Midcontinent Exp. Pipeline, LLC*, 407 S.W.3d 342, 368 (Tex. App.—Houston [14[th] Dist.] 2013, pet. denied) ("a non-breaching party conclusively chooses to treat the contract as continuing if it seeks to benefit from the contract after the other party's material breach.")

-6-

Here, the Landowners should not be excused from unreasonably withholding consent to a mining plan (and thereby preventing Trinity from realizing any benefit under the Lease) while still demanding ongoing royalty payments (and retaining a $705,000 windfall in past royalties). Because the March 14th letter conclusively proves that the Landowners chose to treat the Lease as continuing, and because the Court erroneously refused to consider that letter in its initial opinion, the Court's decision should be reconsidered and the lower court reversed.

**B. The Court applied too high a standard for demonstrating continued performance.**

The Court held that there must be an affirmative contract-related act by the initial non-breaching party to preclude that party from using the defense of prior material breach, and that Trinity did not meet that standard because (1) "the Landowners performed no acts required by the Lease," and instead merely asserted their rights under the Lease, and (2) "Trinity did nothing in response to the requests." This holding is contrary to well-established Texas law.

No case better demonstrates the error in the Court's reasoning than the Texas Supreme Court's decision in *Hanks v. GAB Business Services, Inc.*, 644 S.W.2d 707 (1982). *Hanks* involved the sale of a business. The Supreme Court held that by electing to treat the contract as continuing after Hank's breach of a

-7-

covenant not to compete, GAB deprived itself of any excuse for nonperformance. The Court explained: "A party who *elects* to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part." *Id*. at 708. Significantly, there was *no evidence of* an affirmative act by GAB in furtherance of the sales contract nor was there any evidence of Hanks' performance in response to a request by GAB. Instead, the Supreme Court was persuaded only by evidence that GAB had "*retained* all the assets of the business and continued its operation" during the dispute and subsequent litigation, and by evidence that GAB had *refrained* from electing to rescind the contract, when it could have done so at any time after Hanks' breach. *Id*. In other words, even though the later-breaching party did nothing at all—and simply refrained from asserting its right to terminate the contract—the Supreme Court found that continuing performance had been established. Thus, under *Hanks*, it should be enough that the Landowners refrained from canceling or terminating the Lease. But this record contains much more. It shows that the Landowners made active choices over a period of months to continue the Lease—by among other things, demanding royalty payments under the Lease.

In another Supreme Court case—*Long Trusts v. Griffin*—the only continued-performance evidence the Supreme Court considered was evidence that the later-

-8-

breaching party made a *claim* for damages under the contract. 222 S.W.3d at 415-16. Here, of course, the Landowners likewise made a claim for royalties (which many courts have found to be conclusive). Yet the Court erroneously refused to consider this as evidence of continued performance.

Thus, Texas Supreme Court authority does not support the Court's proposition that some affirmative contract-related act (other than perhaps a *demand* for performance) must be taken to demonstrate an intent to continue performance following a breach by the other party. Nor does Supreme Court authority require evidence that the breaching party took some action in response to a request for performance.

The Court considered three cases in support of the standard it adopted. But these were court of appeals decisions, and all of them merely require the later-breaching party to (1) elect to treat the contract as continuing and (2) insist that the party in default continue its performance. *See Eco Built, Inc. v. Lulfs*, No. 03-08-00427-CV, 2010 WL 3629821, *6 (Tex. App.—Austin, Sept. 17, 2010, no pet.) ("If the non-breaching party elects to treat the contract as continuing and insists the party in default continue its performance, the previous breach constitutes no excuse."); *World Access Telecommunications Grp., Inc. v. Statewide Calling, Inc.*, No. 03-05-00173-CV, 2006 WL 2986227, at *7 (Tex. App.—Austin, Oct. 17,

-9-

2006, no pet.) (same); *Gupta v. Eastern Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (same).

In fact, *Eco Built* fully supports Trinity's arguments on rehearing. In *Eco Built*, Eco Built and Landmark entered into a construction subcontract and disputes arose over performance and payment. *Id.* at *2-4. Landmark terminated the contract and litigation ensued. *Id.* The jury found that both parties breached but that Eco Built breached first. *Id.* at *4-5. On the basis of that jury finding, the trial court awarded judgment to Landmark with no offset for Eco Built's counterclaim for breach. *Id.* at *5. This Court reversed and found that it was error for the trial court to disregard a finding that Landmark breached on the basis of a "who breached first" question. *Id.* at *6. Because Landmark "continued to treat its subcontract with Eco Built as continuing" after Eco Built's breach and did not elect to terminate the contract until after both parties breached, Landmark was not excused from performance and Eco Built was entitled to offset its damages against Landmark's recovery. *Id.*

As support for the standard it adopted, this Court found it significant that "Landmark continued to treat the contract as ongoing by writing payment checks to Eco Built and by demanding, and receiving, performance from Eco Built." (Op. at 19.) Indeed, after Landmark initially notified Eco Built of its default in

November, the parties modified their subcontract in an apparent attempt to work through their differences. It was during this period of negotiations that Landmark made payments and received performance from Eco Built.

Here, the parties entered into similar negotiations about a month after Trinity's breach. Trinity submitted a Third Mine Plan to the Landowners in a final attempt to negotiate a workable solution to the parties' disputes, and the Landowners rejected it on January 7, 2011. (RR9 at P32, App. Y; RR9 at PX34, App.AA.) Significantly, the Landowners *did not* reject the Third Mine Plan on the basis that the Lease was terminated. Instead, the Landowners stated that, in light of the upcoming trial, "[t]he prudent course of action . . . is to wait until the case is tried and a judgment is entered *that sets forth the parties rights and responsibilities under the Lease*." (RR12, DX71, App.AA at 301-302) (emphasis added). Soon thereafter, the Landowners amended their answer and continued to ask for a declaratory judgment determining the ongoing rights of the parties under the Lease. (CR367-68.) This demonstrates that the Landowners considered the Lease to be continuing.

**C.** **Evidence shows that Landowners elected to treat the Lease as continuing.**

When Trinity breached, the Landowners had to make one decision or the other—terminate or continue. No evidence indicates that the Landowners terminated the Lease on or after November 12, 2010. To the contrary, the Landowners repeatedly demonstrated that they intended to treat the Lease as continuing, by filing pleadings and letters expressly stating that they might terminate the Lease in the future and by insisting, on March 14, 2011, that Trinity make a royalty payment, as demonstrated by the chart below.

| Date | Evidence | Record Citation |
|---|---|---|
| Nov. 12, 2010 | Court found Trinity breached by commencement of mining operations without first obtaining written approval of a mining plan. | Op. at 9-11 |
| Jan. 7, 2011 | Letter rejecting Trinity's Third Mine Plan, stating that, in light of the upcoming trial, "[t]he prudent course of action . . . is to wait until the case is tried and a judgment is entered *that sets forth the parties rights and responsibilities under the Lease*." Notably, the Landowners did not reject the mine plan because Trinity had breached and the Lease was terminated. | RR12, DX71, App. AA at 301-302 |
| Jan. 12, 2011 | Letter notifying Trinity of alleged breach, suggesting *possible future action* "to exercise remedies . . . available under the Lease[,]" with no indication that the Landowners elected to terminate the Lease. | CR778-79 |
| Jan. 20, 2011 | 4th Amended Answer: Landowners sought declaratory relief that Trinity is required . . . to fully and reasonably develop each tract of land covered by the Lease." | CR367 |
| Jan. 20, 2011 | 4th Amended Answer: Landowners sought declaratory relief that "[t]he Landowners are entitled to reasonable information from Trinity, including a true and complete | CR367 |

-12-

| | mining plan, certificate of insurance, … a site development plan, a plat showing boundaries, [etc.] | |
|---|---|---|
| Jan. 20, 2011 | 4th Amended Answer: Landowners sought declaratory relief suggesting possible *future* action to "pursue any and all remedies provided in Paragraph 10 of the Lease, including termination of Trinity's right of possession under the Lease, and termination of the Lease"). | CR368 |
| Mar. 14, 2011 | The critical March 14, 2011 letter demanding that Trinity pay royalties that allegedly accrued under the Lease—and after the trial—on March 1, 2011. In the letter, Landowners also informed Trinity that, if Trinity failed to pay, it would be an additional default under the Lease and "Lessors will terminate the lease." | CR3:785 |

Seeking benefits under the Lease (after unreasonably impeding Trinity's right to mine), and affirmatively expressing an intent to treat the Lease as continuing, is more than enough to satisfy the proper standard under Texas law. Thus, the jury's answer to the who-breached-first question is immaterial because the trial court should have given effect to the jury's breach finding against the Landowners. As the court held in *Eco Built*, the trial court erroneously disregarded the finding that Landowners breached on the basis of the "who breached first question," and that error should be corrected. 2010 WL 3629821, *5. Trinity is entitled to recover for Landowners' breach.

## II. Trinity is entitled to offset damages that were conclusively proven at trial and that were more than adequately briefed on appeal.

The trial court erroneously denied Trinity's post-trial motion to modify the judgment to award damages for both parties' breach. The Court should grant

-13-

rehearing and reverse the trial court's judgment, allowing Trinity to recover for the Landowners' breach and offset the Landowners' $25,000 damages against Trinity's $705,000 damages (for a net award in Trinity's favor of $680,000), reverse the Landowner's attorneys' fees award, and award Trinity (the prevailing party) its attorneys' fees as a matter of law. Alternatively, Trinity requests a remand for consideration of the amount of Trinity's damages and/or fees.

The Court refused to consider Trinity's damages arguments because it found that Trinity "offer[ed] no legal support for its contention or citation to authorities" under TEX. R. APP. P. 38.1 and because Trinity did not objection to the predicate instruction telling the jury not to answer the damages question as to Trinity if Trinity breached first. Neither ground is supported by the facts or the law.

A. **Legal sufficiency standards apply even though there was no jury finding.**

The Court erroneously concluded that the lack of a charge objection or jury finding prevents Trinity from seeking or recovering damages as a matter of law. In its opening brief, Trinity cited *PopCap Games, Inc. v. MumboJumbo, Inc.*, 350 S.W.3d 699, 710-12 (Tex. App.—Dallas 2011, pet. denied) for the proposition that "where there is actually no 'adverse finding'" because the jury did not answer a question due to a finding of prior material breach, the "ordinary legal sufficiency

-14-

standards" still apply." (Br. at 15.) Thus, where an appellate court determines that a prior material breach finding is erroneous, it may render damages as a matter of law only if the party "conclusively proved the amount [of damages.]" *Id*.

In *PopCap*, as in the present case, the jury found that MumboJumbo breached (a finding not challenged on appeal), but it did not answer the question inquiring about PopCap's damages resulting from the breach because of its finding that PopCap committed a prior material breach. As Trinity did here, PopCap filed a post-verdict motion on the ground that PopCap had conclusively proved damages of $1.5 million. The trial judge denied PopCap's request.

On appeal, PopCap argued the trial judge erred by failing to render judgment in favor of PopCap on its contract claim against MumboJumbo and failing to award PopCap $1.5 million as damages on that claim, plus attorneys' fees. The court conducted a legal sufficiency review and held that the question presented was whether PopCap conclusively proved the amount of its breach-of-contract damages. Because MumboJumbo admitted that PopCap's breach-of-contract damages were $1.5 million, PopCap's damages were conclusively proven. *Id*. at 711-12.

*PopCap* demonstrates that: (1) preservation can occur by post-trial motion; and (2) damages can be conclusively proven when they are not disputed at trial. It

-15-

is axiomatic that a no-evidence point can be preserved not only by objecting to the jury charge, but also through a motion for directed verdict, a motion for JNOV, a motion to disregard the jury's answer to a vital fact question, or a motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991). Moreover, omissions from a jury charge only waive error if they are not submitted and they are not "conclusively established." TEX. R. CIV. P. 279; Reply Br. at 23 n.10. Here, Trinity timely presented its damages arguments to the trial court in its JNOV motion and motion for new trial. (CR734-35 (arguing that "because the evidence conclusively established Trinity's entitlement to damages, judgment n.o.v. should be entered in Trinity's favor on Questions 4 and 5"); *see also* CR761-63) (arguing that "[b]ecause Trinity established its damages as a matter of law, the Court should amend the judgment to award Trinity its damages and attorneys' fees as a matter of law.")) Both motions were denied. (CR 751-52, 950.)

**B. Trinity offered ample legal support and demonstrated that it had conclusively established damages and fees as a matter of law.**

Trinity complied with the requirements of TEX. R. APP. P. 38.1 by offering over five pages of legal argument, at least ten citations to legal authorities, and a dozen citations to the record. (Brief of Appellant at 41-44; *see also* 14-16, 28-31; Reply Br. at 23-25). Trinity cited *PopCap* to demonstrate how the issue had been

-16-

preserved even without a jury finding, how the legal sufficiency standards applied, and how damages could be established as a matter of law when the party "testified to the amount to be paid under a contract and [the] opposing party concurred in the calculation but disputed liability. (Br. at 15-16, 42). Trinity cited *Hanks*, 644 S.W.2d at 709, *Eco Built*, 2010 WL 3629821, among others, to demonstrate how the offset remedy should be applied when the initial non-breaching party chooses to continue performance. (Br. at 14, 28-41.)

In Part VI of its opening brief, Trinity argued that the evidence conclusively established that Trinity invested $705,000.00 in advance royalties paid to the Landowners in reliance on the Lease. (Br. at 41 citing RR3:95-96; 4:153-54, 4:268-69.) To support this argument, Trinity cited a number of legal authorities outlining the standard for conclusively proving damages as a matter of law:

- *Lofton v. Texas Brine Corp.*, 777 S.W.2d 384, 386 (Tex. 1989) (testimony by an interested witness may establish a fact as a matter of law if the testimony could be readily contradicted if untrue, and is clear, direct and positive, and there are no circumstances tending to discredit or impeach it);

- *Chung v. Lee*, 193 S.W.3d 729, 733 (Tex. App.—Dallas 2006, pet. denied) (when a party "makes a substantial investment in performing the agreement and the agreement is breached, she is entitled to have that investment returned");

- *Lafarge Corp. v. Wolff*, Inc., 977 S.W.2d 181 n.11 (Tex. App.— Austin 1998, pet. denied) (addressing reliance damages).

-17-

Trinity pointed out that the Landowners did not dispute that $705,000 had been paid in advance royalties to the Coe family. (Br. at 42, citing RR4:269.) Nor did they dispute the amount on appeal. (Reply Br. at 23.) Because there is no dispute as to the substantial amount paid by Trinity to the Landowners in reliance on the Lease, the trial court erred when it denied Trinity's post-trial motions. This Court should award Trinity, as a matter of law, the $705,000.00 it paid in advance royalties because the Landowners' breach is no longer excused, resulting in a net award in Trinity's favor of $680,000. *See PopCap*, 350 S.W.3d at at 710-12.

This makes Trinity the prevailing party. As such, Trinity is entitled to fees under TEX. CIV. PRAC. & REM. CODE § 38.001(8) and section 20(e) of the Lease—both of which were cited in Trinity's opening brief. (Br. at 42-43, citing CR35, App. C at 25) (providing that the prevailing party in an action to enforce the terms of the Lease "shall be entitled to reasonable attorneys' fees.") Trinity also cited *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) and *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991) to demonstrate the standards for proving attorneys' fees as a matter of law.

Uncontroverted testimony and evidence adduced at trial conclusively established Trinity's reasonable and necessary attorney fees. Trinity's attorney

-18-

Daniel Richards analyzed the *Arthur Andersen* factors and testified that $196,740.51 was a reasonable amount of fees for Trinity's claims. (RR5:126-129); *Stewart Title*, 822 S.W.2d at 10. Richards also testified that, if the case was appealed, attorneys' fees in the amount of $25,000.00 for an appeal to the Court of Appeals and $10,000.00 for an appeal to the Texas Supreme Court would be reasonable and necessary. (RR5:129-130.) Counsel for the Landowners did not challenge the reasonableness of Trinity's fees. In fact, counsel for the Landowners *conceded* that Trinity's counsel's rates were lower than the usual and customary attorneys' fees for similar claims. (RR6:48); Tex. Civ. Prac. & Rem. Code § 38.003 (presumption that customary attorneys' fees are reasonable).

Because evidence conclusively established the value of attorneys' fees as a matter of law (and because the Landowners' breach cannot be excused), the trial court erred when it failed to correct the judgment. (CR751-52, 950.)

### CONCLUSION AND REQUEST FOR RELIEF

For these reasons, Appellant requests that the Court grant its Motion for Rehearing and reverse the trial court's judgment, rendering damages for Trinity in the amount of $680,000, attorneys fees in the amount of $196,740.51, and appellate attorneys' fees in the amount of $25,000.00 for an appeal to the Court of Appeals and $10,000.00 for an appeal to the Texas Supreme Court. Alternatively,

-19-

Trinity asks for a remand for the consideration of the amount of Trinity's damages and/or attorneys' fees. Trinity asks for all other relief to which it may be entitled in law or equity.

Respectfully submitted,
*/s/ Heather Bailey New*
Heather Bailey New
State Bar No. 24007642
hnew@bellnunnally.com
Jason P. Steed
State Bar No. 24070671
jsteed@bellnunnally.com
**BELL NUNNALLY & MARTIN, LLP**
3232 McKinney Avenue, Suite 1400
Dallas, Texas 75204
(214) 740-1400
(214) 740-1499

ATTORNEYS FOR APPELLANT
TRINITY MATERIALS, INC.

-20-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was delivered to the following persons on February 13, 2015, through the Efile.TXCourts.gov electronic filing system:

Don H. Magee
Julian Lockwood
April Lucas
MCGINNIS, LOCHRIDGE & KILGORE, L.L.P.
600 Congress Ave., Suite 2100
Austin, Texas 78701
Tel: (512) 495-6040
Fax: (512) 505-6340

*/s/ Heather Bailey New*

Heather Bailey New

-21-

## CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 4,4,51 words (excluding the caption, identity of parties and counsel, table of contents, table of authorities, signature, proof of service, certification, certificate of compliance, and appendix). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Heather B. New

Heather B. New

-22-

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00483-CV

### Trinity Materials, Inc., Appellant

### v.

### Carroll Sansom, James Sansom, and Robert Coe, Appellees

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GN-09-004105, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Trinity Materials, Inc. appeals the district court's judgment on a jury verdict in favor of appellees Carroll Sansom, James Sansom, and Robert Coe (Landowners) in a breach of contract suit. We will affirm the district court's judgment.

### Background

Trinity and the Landowners entered into a sand and gravel mining lease (Lease) in 1999. The land covered by the Lease consists of three properties owned by the Landowners—a 104-acre tract, a 139-acre tract, and a 176-acre tract. Trinity did not begin mining on the Lease property immediately and instead paid advance royalties to the Landowners each year as allowed under the Lease. In 2003, citizens living in the area near the Landowner's property incorporated the Village of Webberville. The Village Council enacted several ordinances that required mining permits and created zoning regulations that were applicable to the type of mining covered in the Lease.

EXHIBIT
1

27

These ordinances impeded Trinity's ability to mine on the Lease property and, in response, Trinity proposed several solutions to the Landowners, including challenging the constitutionality of the ordinances, tolling the Lease until the impediments could be resolved, and attempting to meet the ordinance requirements by re-zoning the Lease properties from agricultural to sand-and-gravel classification and obtaining the requisite permits. The re-zoning solution was proposed after Trinity had convinced the Village to add a less restrictive sand-and-gravel zoning classification to the ordinances, but when Trinity asked the Landowners to sign the re-zoning forms, the Landowners resisted. In response, Trinity filed suit against the Landowners, claiming that the Landowners were contractually obligated under the Lease to assist in Trinity's re-zoning efforts by agreeing to re-zone the three Lease properties.

Despite its pending suit, Trinity decided to move forward with mining the portions of the Lease property located in the Village's extra-territorial jurisdiction (ETJ)—areas they believed were outside the scope of the mining and zoning ordinances. In accordance with Lease requirements, Trinity submitted a mining plan to the Landowners for their approval on June 22, 2010. The Landowners rejected the plan on July 22, 2010, claiming that the details in the plan were insufficient.[1] Despite this rejection, Trinity began moving mining equipment onto the property, prompting the Landowners to obtain a temporary restraining order to stop the activity. Trinity

---

[1] The mining plan submitted by Trinity was approximately half a page in length. The plan briefly described the area to be mined, listed the order and portions of the tracts to be mined, identified one tract that was not to be mined due to insufficient deposits, affirmed that all work would be done according to industry standards, and described how the materials would be removed from the property and how the land would be reclaimed. Both parties presented expert witness testimony during the trial related to the sufficiency of the plan. Trinity's witness, Jerry McCalip testified that the plan was sufficient according to industry standards. The Landowner's witness, Ricky Wayne Thomas, claimed that the plan was deficient and should have included many more details.

2

submitted a second mining plan to the Landowners on August 27, 2010, that was nearly identical to the first plan, but included specifications for a road for ingress and egress. The Landowners did not respond to the second plan in writing, but expressed their rejection of it at a hearing related to the TRO on September 8, 2010. On October 13, 2010, the Landowners obtained a temporary injunction against Trinity's mining operations, but it was contingent upon a $150,000 bond that the Landowners never filed.

Meanwhile, Trinity sent a request to the Village for all applicable zoning and mining ordinances, but the City's response did not include any that applied to the ETJ. So, despite not having an approved mining plan from the Landowners, but believing their actions to be in accordance with the Village's ordinances, Trinity decided to mine in the ETJ.[2] On November 12, 2010, Trinity began mining on the Lease's 104-acre tract. The Village obtained and delivered to Trinity at the mining site a stop-work order and TRO. Trinity's employees, believing the orders to be erroneously issued, continued working for several more hours until a piece of equipment broke down and forced them to stop. Trinity did not resume mining operations at the site. Soon thereafter, the Village sued both Trinity and the Landowners for failure to comply with newly enacted Site Development Ordinances only then brought to Trinity's attention.

On December 17, 2010, Trinity submitted a third mining and construction plan, which included a few additional details, including a timeline for completion and a map of the road to be used for ingress and egress. The Landowners rejected this plan on January 7, 2011, explaining that it "suffers from the same shortcomings" as the prior plans. A short time later, the Landowners

---

[2] Two days before Trinity began mining, the Village's attorney sent an email to Trinity and the Landowners, referencing ordinances that applied to property located in the ETJ. This email, however, did not contain copies of the actual ordinances to which it referred.

3

sought indemnity from Trinity in connection with the Landowners being included in the Village's suit, specifically seeking $36,338 for their legal fees incurred between November 3 through 30, 2010 under the Lease's indemnity clause.[3]  Trinity declined.

Trinity's suit against the Landowners finally went to trial in February 2011.  At trial, Trinity sought recovery of its advance royalty payments on two breach theories:  (1) the Landowners breached the Lease when they failed to cooperate with the re-zoning efforts; and (2) the Landowners breached the Lease by unreasonably withholding their approval of Trinity's mining and construction plans.  Following the presentation of evidence and arguments of counsel, the Landowners moved for a directed verdict on the first of Trinity's breach theories.  The trial court granted the Landowners' motion, finding that the Lease created no duty for the Landowners to agree to re-zone their properties and that the Landowners had not breached an implied covenant when they refused to do so.  During the charge conference, Trinity sought, but was denied, a question and related instruction on the re-zoning issue,[4] and the trial court advised the jury in the charge that the Landowners had made no express or implied promise to apply for re-zoning in the Lease.  Accordingly, as to Trinity's claims, the jury was asked only whether the Landowners had failed to comply with the Lease by "unreasonably withholding consent to a mining plan and/or construction plan," to which they ultimately responded, "Yes."

---

[3]  The indemnity clause included in the Lease requires Trinity to indemnify the Landowners for their attorneys' fees in defending against any claims arising from any penalty, damage, or charge imposed for the violation of any law or breach of the Lease by Trinity in the event the Landowners are made parties to a lawsuit against Trinity.

[4]  Trinity made no other objections to the jury charge and, in fact, affirmatively stated that it had no objections to the charge.

4

As to the Landowners, who had counterclaimed seeking declaratory relief and damages on four breach theories, the jury was simply asked whether Trinity had failed to comply with the Lease, to which the jury answered, "Yes." The jury was then asked, based on its findings that both Trinity and the Landowners had failed to comply with the Lease, who had failed to comply with the Lease first, to which it responsed, "Trinity." Next, having been given instructions directing it to answer only certain questions depending on its answers to the first three questions, the jury determined the Landowners' damages. Specifically, the jury found that Trinity should pay $25,000 to compensate the Landowners for their damages and $532,023.28 to compensate the Landowners for attorney's fees incurred in the present suit. After denying both parties' motions to disregard the jury's findings and Trinity's motion for judgment notwithstanding the verdict, the district court entered judgment awarding the Landowners $25,000 in compensatory damages and $497,023.28 in attorney's fees.[5] It is from this judgment that Trinity now appeals.

**Analysis**

Trinity raises six issues on appeal, asking this Court to determine (1) whether there is legally and factually sufficient evidence to support the jury's findings that Trinity failed to comply with the Lease and that it failed to do so first; (2) whether the affirmative defense of prior material breach can be predicated on breach of an indemnification clause; (3) whether the Landowners decision to treat the Lease as continuing after Trinity's alleged breach precluded the Landowners from relying on the excuse of prior material breach; (4) whether the trial court committed charge error by refusing to include Trinity's requested jury questions and instruction; (5) whether legally

---

[5] The district court also awarded the Landowners appellate fees of $25,000 and $10,000 for unsuccessful appeals by Trinity to the Court of Appeals and Texas Supreme Court, respectively.

5

and factually sufficient evidence supports the jury's $25,000 damage award; and (6) whether Trinity is entitled to damages and attorney's fees as a matter of law because the jury found that the Landowners failed to comply with the Lease.

**Trinity's breach**

The starting point for our analysis of Trinity's evidentiary-sufficiency challenges to the jury's findings regarding Trinity's failure to comply with the Lease is the jury charge.[6] *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003) ("Before a court can properly conduct a factual sufficiency review, it must first have a clear understanding of the evidence that is pertinent to its inquiry. The starting point generally is the charge and instructions to the jury."); *Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.). Here, questions 1 through 3 presented the jury with the questions regarding the parties' compliance with the terms of the Lease.

---

[6] The standard of review for evidentiary sufficiency is well known. We may sustain a legal sufficiency challenge only if the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960)). In determining whether a finding is supported by legally sufficient evidence, we view the evidence in the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id*. at 807. We indulge every reasonable inference that would support the finding. *Id*. at 822.

In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence presented at trial, including any evidence contrary to the judgment. *Plas-Tex, Inc. v. U.S. Steel Corp*., 772 S.W.2d 442, 445 (Tex. 1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We set aside a finding for factual insufficiency if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176.

6

Question 1, not challenged on appeal, asked the jury, "Did the Landowners fail to comply with the Sand and Gravel Lease by unreasonably withholding consent to a mining plan and/or a construction plan?"[7]  Question 2 asked the Jury, "Did Trinity fail to comply with the Sand and Gravel Lease?"[8]  Having answered "yes" to both questions 1 and 2, the jury was then instructed to answer Question 3:  "Which of those named below failed to comply with the Sand and Gravel Lease first?"  The jury responded, "Trinity."

Stated generally, Trinity's argument at trial was that it had fulfilled its obligation under the Lease by paying the Landowners $705,000 in advance royalties since 1999 and, in turn, that it had the right under the Lease to mine the property for sand and gravel.  But when it was ready to exercise those mining rights, Trinity argued, and submitted three separate mining plans to the Landowners for their approval as required by the Lease, the Landowners unreasonably withheld their approval of those plans, thereby thwarting Trinity's ability to mine and, as a result, breaching the Lease.  The Landowners countered at trial that their refusals of Trinity's mining plans were reasonable and, moreover, that Trinity had breached the Lease by commencing mining operations without first getting the required approval from the Landowners, disregarding a Village ordinance and stop-work order, failing to perform mining operations in a "prudent and workmanlike manner,"

---

[7]  The jury was also instructed in connection with Question 1 that (1) "'unreasonably withholding consent' should be determined by reference to the terms and conditions of the Sand and Gravel Lease"; (2) "in addition to express promises, every contract contains an implied promise that a party will not do anything to delay or prevent the other party from performing his part of the contract"; and (3) "the Landowners made no express promise to apply for rezoning of their property and there is no implied promise to apply for rezoning."

[8]  The jury was instructed in connection with this question that "a city ordinance is presumed valid."

and failing to indemnify the Landowners when they were included in the Village's lawsuit against Trinity.

### Basis for jury's finding that Trinity failed to comply with the Lease

As an initial point, Trinity argues that the only possible basis for the jury's finding that Trinity failed to comply with the Lease is the Landowners' argument that Trinity failed to indemnify the Landowners for their inclusion in the Village lawsuit. Stated in the converse and in Trinity's words, Trinity maintains that "the jury's breach finding cannot be based on the Landowners' allegations that Trinity mined without prior approval, deliberately and knowingly disregarded the Site Development Ordinance, or failed to act in a 'reasonable prudent and workmanlike manner.'" Trinity bases this position on Question 6 of the jury charge:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Landowners for their damages, if any, that resulted from Trinity's failure to comply?
>
> Consider only the reasonable fee, if any, for the necessary services of the Landowner's attorneys in the suit by the Village of Webberville and all costs and expenses, if any, incurred by the Landowners in connection with that litigation.

Trinity contends that the above-listed instruction to Question 6 limited the jury to awarding the Landowners only those damages incurred as a result of Trinity breaching the Lease's indemnity clause. By extension, Trinity continues, the Jury's "yes" answer to Question 2 must also be predicated on a finding that Trinity breached the Lease's indemnity clause. Thus, Trinity concludes, our evidentiary-sufficiency review is limited to determining whether there is legally and factually sufficient evidence to support a finding that Trinity failed to comply with the Lease's indemnity provision. We disagree. Question 2 was submitted in broad form, without objection, as

8

follows: "Did Trinity fail to comply with the Sand and Gravel Lease?" As written, the jury could have found a failure to comply with the Lease based on any contractual obligation under the Lease, including, but *not* limited to, any of the breach theories offered by the Landowners: failing to indemnify the Landowners, ignoring the ordinance and stop work order, or failing to operate in a reasonably prudent manner. *See Eco Built, Inc. v. Lufts*, No. 03-08-00427-CV, 2010 WL 3629821, at *9 (Tex. App.—Austin Sept. 17, 2010, no pet.) (mem. op.) (holding that broad-form submission of breach question allowed jury to find breach based on any contractual obligation). Nor is it necessary to know the basis. Because it was not objected to, we may uphold the jury's finding in Question 2 as long as legally and factually sufficient evidence supports the jury's finding on a theory contemplated under the jury charge. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 & n.1 (Tex. 2000) (upholding jury's discrimination finding because one of three theories presented to jury charge was supported by legally sufficient evidence, although reducing damages award for theories not supported by legally sufficient evidence); *see also* Tex. R. Civ. P. 274 ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.").

### *Evidentiary sufficiency of jury's finding that Trinity failed to comply*

Having determined that we must uphold the jury's finding in Question 2 if legally and factually sufficient evidence supports that finding on a theory contemplated by the charge, we now address Trinity's evidentiary sufficiency challenge to the jury's finding that Trinity failed to comply with the Lease. Because it is undisputedly an obligation under the Lease, was a theory offered by the Landowners at trial, and is dispositive of this and other issues on appeal, we will focus on the evidence, largely undisputed, relating to the Landowner's allegation that Trinity began mining

9

operations without first obtaining written approval of a mining plan from the Landowners as required by the Lease.

Under the terms of the Lease, Trinity must submit a mining or construction plan to the Landowners and get their written approval before beginning any construction or mining activities on the Lease property. Although the Lease does not specify the contents of the plan, any such approval from the Landowners may "not be unreasonably withheld."[9] As discussed, Trinity submitted three separate mining plans to the Landowners for their approval in hopes of starting some sort of mining operations to recoup the $705,000 in advance royalty payments before the Lease term ended. The Landowners rejected all three of Trinity's mine plans. The following are the undisputed dates of submission and rejection of those plans:

|  | First Plan | Second Plan | Third Plan |
| --- | --- | --- | --- |
| Submitted | June 22, 2010 | August 23, 2010 | December 17, 2010 |
| Rejected | July 22, 2010 | September 8, 2010[10] | January 7, 2011[11] |

---

[9] Specifically under the Lease, Trinity agrees that (g) "prior to construction of any plants, roads, or other improvements to submit a construction plan to [Landowners] for [Landowner's] prior written approval, such approval not to be unreasonably withheld"; (h) prior to commencement of mining, to submit a mining plan to [Landowner] for [Landowner's] prior written approval, such approval not to be unreasonably withheld."

[10] There was no written rejection to the second plan, but the Landowners expressed their rejection at a temporary injunction hearing.

[11] The letter is misdated as January 7, 2010, but refers to events in 2011.

10

The evidence is also undisputed that on November 12, 2010, between its submission of the second and third plans and also between the Landowners' respective rejections of those plans, Trinity began mining operations on the 104-acre tract of the Lease property. Although the mining only lasted for five hours and Trinity was not able to garner any marketable material, the Village obtained a restraining order against Trinity and later filed suit against both Trinity and the Landowners as a result of the November 12 mining operations. Trinity's witness Matthew Hallmark acknowledged that Trinity began mining operations on November 12, 2010, and that it had done so without obtaining the Landowners' approval of a mine plan. He also testified that Trinity would not have stopped mining that day but for the fact that a piece of equipment had failed. Trinity's president, Carl Campbell, admitted that Trinity began mining on the Lease property in November 2010, but that they had not done any additional mining since that time. Finally, a lawyer for the Village, Monte Swearengen, testified that Trinity began mining operations on the 104-acre tract on November 12, 2010, and that those operations led to a temporary injunction hearing and, ultimately, to the Village's suit against Trinity and the Landowners. We hold that, under the applicable standard of review, this evidence is legally and factually sufficient to support the jury's finding that Trinity failed to comply with the Lease. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Trinity argues that even if it breached the lease by mining without approval on November 12, 2010, that breach was excused by the Landowners' unreasonable withholding of consent to its mine plan. As stated by Trinity:

> Given the jury's answer to Question 1 (that the Landowners breached by unreasonably withholding consent to the mine plan), the jury's finding that Trinity

11

breached the Lease *cannot* be based on the Landowners' allegation that Trinity commenced mining without obtaining written approval.

But Trinity's argument here incorrectly states the jury's finding regarding the Landowners' actions and, further, its argument assumes that the jury found that the Landowners failed to comply with the Lease by rejecting the second plan—i.e., on August 23, 2010. In other words, Trinity's argument here is that, if it breached by mining without approval on November 12, 2010, that breach must have occurred after the Landowners breached because the jury found in Question 1 that the Landowners failed to comply with the Lease on August 23 when they rejected Trinity's second plan. That assumption, and thus the basis for Trinity's argument here, is faulty. The question submitted to the jury was whether the Landowners failed to comply with the Lease by "unreasonably withholding consent to *a* mining plan," not to one of the three specific mining plans. (Emphasis added.) As such, the jury's answer to Question 1 indicates only that it found that the Landowners had unreasonably rejected at least one of the three mining plans. Given, as shown in the chart above, that three plans were submitted and that the last possible rejection by the Landowners occurred in January 2011, and given the form of the question, the jury could have found a failure to comply with the Lease based on the Landowners' rejection of any one of the three plans, including the last, meaning that Trinity would have breached first. *See Eco Built*, 2010 WL 3629821, at *9.

### *Evidentiary sufficiency of jury's finding that Trinity failed to comply first*

This incorrect assumption regarding the basis of the jury's finding in Question 1 is presumably at least one source of Trinity's second evidentiary-sufficiency challenge, this one to the evidence supporting the jury's finding that Trinity failed to comply with the Lease first. Again, the finding Trinity challenges here—i.e., that Trinity failed to comply first—was reached by the jury in

12

answering a question that simply asked whether Trinity or the Landowners "failed to comply with the Sand and Gravel Lease first?" We may uphold the jury's answer to that question if legally and factually sufficient evidence supports any theory contemplated under the jury charge. *See Zimlich*, 29 S.W.3d at 69 & n.1; *Eco Built*, 2010 WL 3629821, at *9.

First, as discussed previously in connection with Trinity's challenge to the Jury's answer to Question 2, the evidence in the record conclusively established that Trinity mined on Lease property without approval on November 12, 2010. Thus, there is legally and factually sufficient evidence to support a finding that Trinity failed to comply with the Lease on November 12, 2010. Next, although the jury's finding to Question 1 (that the Landowners failed to comply) is not challenged on appeal,[12] we consider the evidence of the Landowners' breach as it relates to the jury's answer to Question 3—specifically evidence supporting a finding that the Landowners failed to comply with the Lease by unreasonably rejecting the third plan in January 2011—because that occurred after the November 12, 2010 breach by Trinity. Although Trinity is correct that the Landowners rejected the third plan because it "suffered from the same shortcomings as the prior mine plans," the jury could still find that the Landowners reasonably rejected the prior plans, but unreasonably rejected the third plan given the evidence. Trinity's president, Campbell, testified that the third plan was an effort to recoup its losses. Trinity's general operations manager, Hallmark,

---

[12] Trinity, arguing in its reply brief that "the jury *could not* have found that the first and only breach occurred on January 7 when the Landowners rejected the Third Mine Plan," purports to raise an evidentiary-sufficiency challenge to Question 1: "The letter [rejecting the third plan] and expert testimony [stating that the third plan suffers from the same shortcomings as the prior plans] prove the opposite of a vital fact, making reversal on legal sufficiency grounds appropriate." We disagree about the evidence in the record, which we discuss above, but regardless, Trinity did not object to the form of Question 1 at trial and, more importantly, could not do so on appeal and hope to prevail on appeal.

13

testified that the third plan represented Trinity's efforts to make a plan that would satisfy, or be the least objectionable to, the Village and its residents and that would allow it to mine and get its royalties with the least amount of conflict. To that end, based on discussions with Village principals, the third plan proposed mining in an area of the Lease property that was farthest away from the Village's populated areas and would not add traffic to Village roads. Hallmark also testified that the third plan alleviated the Landowners' concerns about leaving a channel across their properties. Finally, Hallmark testified that the third plan represented Trinity's best ideas for resolving all the various concerns. The Village's attorney, Monte Swearengen, acknowledged that the Village, or at least people involved with its management, were interested in resolving the issues and had discussed Trinity's suggestion of mining the parcel of land contemplated in the third plan. Viewing the evidence in the light most favorable to the jury's verdict and indulging every reasonable inference that would support the finding, the jury could have reasonably found that the Landowners reasonably rejected the first and second plans but unreasonably rejected the third plan. Likewise, viewing all the evidence, those same findings are not "so contrary to the overwhelming weight of the evidence so as to be clearly wrong and unjust." *See Cain*, 709 S.W.2d at 176. Accordingly, a jury finding that the Landowners failed to comply with the Lease by rejecting the third plan in January 2011 is supported by legally and factually sufficient evidence. That, combined with the conclusive evidence that Trinity breached on November 12, 2010, likewise provides the requisite evidentiary support for the jury's finding that Trinity failed to comply with the Lease first.

Finally, Trinity argues that even if it breached the Lease by mining without prior approval from the Landowners, that breach cannot be considered material because Trinity only mined for about five hours. Initially, we note that although the jury did not make a specific finding

14

on this element, it is deemed found under Texas Rule of Civil Procedure 279 if it was omitted without request or objection and there is factually sufficient evidence to support the finding. *See* Tex. R. Civ. P. 279. As such, we take Trinity's argument here to be an evidentiary-sufficiency challenge to the jury's deemed materiality finding.

"In determining the materiality of a breach, the [fact finder] will consider, among other things, the extent to which the non-breaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994) (citing *Restatement (Second) of Contracts* § 241(a) (1981)). The fact finder may also consider "(i) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (ii) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (iii) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (iv) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Id*. The evidence shows that Trinity's breach involved the Landowners' property rights, damage or change to real property, and implicated a specific term of the Lease. That term, as set forth above, required Trinity to provide the Landowners with a mining plan and obtain their written approval "prior to commencement of mining." That appears to be the only provision in the Lease that gives the Landowners any active oversight or insight into the mining process. The evidence also shows that Trinity's actions in breaching this particular provision of the Lease were admittedly deliberate and possibly in bad faith—Trinity witnesses testified that Trinity decided that the Landowners were being unreasonable in rejecting its plans and that it would begin mining despite the lack of approval. A November 11,

15

2010, letter from the Landowners' attorney notified Trinity that the Landowners are aware that Trinity has moved mining equipment onto the Lease property and warns it not to begin mining without approval. Trinity witnesses testified that Trinity would not have stopped mining on November 12, 2010, but for the fact that its machinery broke down. All this was done while Trinity's suit against the Landowners was pending. Considering the relevant evidentiary standards, we conclude that the jury's implied finding of materiality is supported by legally and factually sufficient evidence. *See* Tex. R. Civ. P. 279; *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

We overrule Trinity's first issue.

**Breach of the indemnification clause**

In its second issue on appeal, Trinity asks whether the Landowners' affirmative defense of prior material breach can be predicated on a breach of an independent indemnification clause in the Lease. Stated another way, Trinity argues that because the jury found that Trinity failed to comply with the Lease's independent indemnity clause, Trinity should be allowed to recover its damages because the affirmative defense of prior material breach only excuses breaches of mutually dependent contract obligations. But Trinity's argument here relies, and falls, on the incorrect assumption that the jury found that Trinity had failed to comply with the Lease by refusing to indemnify the Landowners. As discussed above, however, the broad-form submission of Question 2, which simply asked the jury whether Trinity failed to comply with the Lease, means that the jury could have relied on any breach theory. *See Eco Built*, 2010 WL 3629821, at *9. Accordingly, we overrule Trinity's second issue. *See* Tex. R. App. P. 47.1.

16

**Excuse**

In its third issue, Trinity argues that it is entitled to its damages caused by the Landowners' breach even if it breached the Lease first because the Landowners treated the contract as continuing after Trinity's breach. In support of this argument, Trinity relies on the rule in contract law that "[w]hen a contracting party commits a material breach, the non-breaching party must elect between two courses of action, either continuing performance under the contract or ceasing performance and terminating the contract." *Eco Built*, 2010 WL 3629821, at *6 (citing *Gupta v. Eastern Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *World Access Telecomms. Grp., Inc. v. Statewide Calling, Inc.*, No. 03-05-00173-CV, 2006 WL 2986227, at *7 (Tex. App.—Austin Oct. 17, 2006, no pet.) (mem. op.)); *see also Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (noting "fundamental principle of contract law" that "when one party commits a material breach of that contract, the other party is discharged or excused from further performance") citing *Hernandez*, 875 S.W.2d at 692)). The rule is also related to waiver in that it, in essence, deems treating a contract as continuing after a breach as a waiver of the excuse for non-performance. *See Eco Built*, 2010 WL 3629821, at *6; *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887–88 (Tex. App.—San Antonio 1996, writ denied) (describing rule as "waiver of excuse for non-performance").

According to Trinity, the Landowners violated the continuing-performance rule by—

- sending a demand letter for $36,388.50 and requesting indemnification under the Lease on December 23, 2010;

- failing to terminate the Lease when Trinity had not done so ten days later;

17

- seeking its royalty payment in March 2011;

- notifying Trinity in January 2011 of Trinity's alleged breach and "possible *future action*" under the Lease, but with no notification of termination of the Lease; and

- seeking declaratory judgment to enforce continuing obligations under the Lease and the right to pursue future termination of the Lease.

In sum, Trinity alleges that the Landowners "continued performance" under the Lease by asserting their rights under the Lease and treating the Lease as if it were not terminated. But a careful reading of *Eco Built* and the cases it cites as authority for this rule shows that more is required to constitute continuing performance.

In *Eco Built*, we held that the initial non-breaching party, Landmark, was not excused from its payment obligations under the breached contract because it had treated the contract as continuing *and* had continued to demand performance from Eco Built, the initial breaching party. Specifically, after Eco Built had materially breached the contract, Landmark continued to treat the contract as ongoing by writing payment checks to Eco Built and by demanding, and receiving, performance from Eco Built. *See Eco Built*, 2010 WL 3629821, at *6. Similarly, in *World Access*, we held that the initial non-breaching party was not excused from paying for services it had previously received under the breached contract simply because the other party had breached first, nor was it excused from paying for services it actually received even though the other party was already in breach. *See World Access*, 2006 WL 2986227, at *8. Likewise, in *Gupta*, the Houston Fourteenth Court of Appeals held that the initial non-breaching party, Gupta, was not discharged or excused because post-breach he, for example, took over the billing obligations, demanded and received payment for a physician's salary, and continued to provide billing

18

information as required by the agreement.  *See Gupta*, 140 S.W.3d at 757.  In sum, in each of these continuing-performance cases, the court required an affirmative contract-related act required under the contract by the initial non-breaching party to preclude that party from using the defense of prior material breach.

The assertions Trinity makes regarding the Landowners' actions, with one possible exception, do not meet this standard.  The actions Trinity describes are simply the Landowners' expressions or assertions of their rights under the Lease.  But the Landowners performed no acts required by Lease, and Trinity did nothing in response to the requests.  There is nothing in the record that even comes close to the actions taken by the parties in the *Eco Built*, *Gupta*, and *World Access* cases.  And with regard to the possible exception mentioned, an alleged post-trial demand by the Landowners in March 2011 for their royalty payment, that document is not part of the appellate record and, as such, may not be considered on appeal.  *See* Tex. R. App. P. 34.1; *Save Our Springs Alliance, Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 892 (Tex. App.—Austin 2010, pet. denied) ("We are limited to the appellate record provided."); *Burke v. Insurance Auto Auctions Corp*., 169 S.W.3d 771, 775 (Tex. App.—Dallas 2005, pet. denied) (documents that are cited in brief and attached as appendices may not be considered by appellate courts if they are not formally included in record on appeal).

We overrule Trinity's third issue.

**Charge error**

In its fourth issue, Trinity challenges the district court's refusal to submit the following two additional jury questions and related instruction offered by Trinity:

19

**[Requested] QUESTION NO.1**

Did [the Landowners] fail to comply with the lease by not signing the Owner Certification forms for the Village of Webberville Zoning Change Request Application?

**[Requested] INSTRUCTION NO.2 TO [Requested] QUESTION NO.1**

You are instructed that [the Landowners] failed to comply with the Sand and Gravel Lease if it requires that they sign the Owner Certification forms for the Village of Webberville Zoning Change Request Application.

**[Requested] QUESTION NO.3**

Did [the Landowners] fail to comply with the lease by not granting Trinity peaceful possession of the premises for purposes of Trinity's operations?

*Standard of review*

The province of a jury is to judge the credibility of witnesses and resolve factual disputes, *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999), which it does by answering the questions presented to it in the court's charge. The trial court must submit to the jury the questions, definitions, and instructions "raised by the written pleadings and the evidence." Tex. R. Civ. P. 278; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). The rule imposes "a substantive, nondiscretionary directive to trial courts [that requires] them to submit requested questions to the jury if the pleadings and any evidence support them." *City of The Colony v. North Tex. Mun. Water Dist.*, 272 S.W.3d 699, 746 (Tex. App.—Fort Worth 2008, pet. dism'd) (citing *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992)). Accordingly, we review the trial court's refusal to submit questions de novo. *Financial Ins. Co. v. Ragsdale*, 166 S.W.3d 922, 926 (Tex. App.—El Paso 2005, no pet.); *see Exxon Corp. v. Perez*, 842 S.W.2d 629, 631 (Tex. 1992) (per curiam) (holding it is reversible error to deny submission of question raised by pleadings and evidence).

20

*Requested Question No.1*

In support of its argument regarding Requested Question No.1 and related instruction, Trinity points to the undisputed evidence adduced at trial that the Village could not issue a mining permit unless the property first complied with the Village's zoning requirements; that Village zoning changes could be made only with the written consent of the property owners; and that the Landowners never agreed to re-zone the Lease properties. Trinity also points to evidence, mainly testimony from its witnesses, that it contends shows that the Landowners refused to cooperate with Trinity in its efforts to re-zone the property, including the following:

- The Landowners never proposed any alternatives to re-zoning that would allow Trinity to mine, despite the fact that Trinity sought ideas from the Landowners;

- Trinity requested a type of re-zoning that would not require the Landowners to deed their land to the Village, but the Landowners' attorney suggested, the witness thought as a delaying tactic, that such an ordinance did not exist;

- Trinity did not ask the Landowners to go to any meetings or prepare any studies;

- The Landowners said they would never agree to re-zone all three properties at the same time; and

- The Landowners requested a large amount of information that they said they needed before they would even consider a zoning change.

Finally, Trinity emphasizes provisions in the Lease that (1) impose a duty on Trinity to comply with all ordinances and (2) gives Trinity, in conducting mining, processing, and removal operations, "the right to do all things necessary or convenient in carrying out the purpose of" the Lease.

Trinity argues that this evidence and its pleadings "presented a disputed fact issue as to whether Landowners's refusal [to agree to re-zone their properties] breached either express or implied terms or duties under the Lease." Therefore, Trinity continues, it was mandatory for the

21

district court to present the jury with a question and accompanying instruction on that issue, and its failure to do so was an error that requires a new trial. We disagree.

The conduct required by the parties under a contract is a question of law. *See Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 186 (Tex. App.—Austin 1998, pet. denied); *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 807 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *see also X Techs., Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 413–14 (5th Cir. 2013) (citing *Meek*, 919 S.W.2d at 805). Any dispute concerning the failure of a party to comply with the contract is a fact question for the jury. *See Lafarge*, 977 S.W.2d at 186*; Meek*, 919 S.W.2d at 807. Stated another way, the "judge determines what conduct is required of the parties and, insofar as a dispute exists concerning the failure of a party to perform the contract, the judge submits the disputed fact questions to the jury." *Lafarge*, 977 S.W.2d at 186 (citing *ITT Commercial Fin. Corp. v. Riehn*, 796 S.W.2d 248, 253 n.3 (Tex. App.—Dallas 1990, no writ)). Thus, under these principles, Trinity is entitled to Requested Question No.1 only if the Lease obligates the Landowners to agree to re-zone the Lease properties and, then, only if the evidence and pleadings raise a fact question regarding the Landowners' compliance with that obligation (not relevant here because the evidence is conclusive that the Landowners did not agree to re-zone).

Despite Trinity's seeming suggestion to the contrary, the Lease has no provisions requiring the Landowners to take any affirmative action regarding re-zoning. The bulk of the burden and rights under the Lease belong to Trinity, including Trinity's obligation under the Lease to comply with any applicable ordinances. Likewise, we find no support for Trinity's argument that the Lease imposes an implied duty on the Landowners to agree to re-zone their property. Texas law does not favor implied covenants. *Nalle v. Taco Bell Corp.*, 914 S.W.2d 685, 687 (Tex. App.—Austin

22

1996, writ denied). We will look beyond the written agreement and imply a covenant only if it is "necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole." *Danciger Oil & Ref. Co. v. Powell*, 154 S.W.2d 632, 635 (Tex. 1941). An implied covenant is sufficiently necessary to the parties' intentions only if the obligation "was so clearly within the contemplation of the parties that they deemed it unnecessary to express it. . . ." *Id.*; *see Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009) (noting that terms are implied because "the parties must have intended them and have only failed to express them"). We will not imply a covenant simply because it is needed to make the contract fair, wise, or just. *Nalle*, 914 S.W.2d at 687. Here, a Trinity witness explicitly acknowledged that the parties did not contemplate that the Village would form or pass ordinances. *See Mann Frankfort*, 289 S.W.3d at 850. Further, the topic of ordinances is covered in the Lease, and the burden of complying with them is placed squarely on Trinity. *See Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944, 947 (Tex. 1984) ("There can be no implied covenant as to a matter specifically covered by the written terms of the contract." (citing *Freeport Sulphur Co. v. American Sulphur Royalty Co.*, 6 S.W.2d 1039, 1042 (Tex. 1928))).

Trinity also argues that the Landowners breached the duty to cooperate implied in every Texas contract in which cooperation is necessary for performance of the contract. *See Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 770 (Tex. App.—Dallas 2005, pet. denied). This duty requires that a party to a contract may not hinder, prevent, or interfere with another party's ability to perform its duties under the contract. *See id.* Under the Lease, stated generally, Trinity had to pay yearly advance royalty payments until it began mining to maintain its mining option, but it could terminate the Lease at any time after the fifth year. When it began mining

23

operations, it was obligated to pay royalties based on the mining production, with certain applied minimums, and meet various other obligations in connection with the mining operations, including the one at issue here, to comply with any applicable ordinances. The Landowners did nothing to hinder or interfere with Trinity's ability to perform any of these *duties*. At most, the Landowners arguably interfered with Trinity's pursuit of benefits incidental to the full execution of its obligations under the Lease. *See Case Corp.*, 184 S.W.3d at 774 (distinguishing performance of agreements from benefits derived from agreement in determining whether party had duty to cooperate). Further, no implied duty to cooperate would have required the Landowners to burden their properties with zoning designations when the Lease did not specifically require them to do so and where not doing so did not prevent Trinity from fulfilling its obligations under the Lease.

We hold that the Lease does not obligate the Landowners to re-zone their properties. Because there is no obligation under the Lease that would require the conduct contemplated by Trinity's Requested Question No. 1, Trinity was not entitled to a jury question, or its related instruction, to resolve a fact question regarding Landowners' compliance with that conduct, which Trinity asserts does not exist in any event.

### Requested Question No.3

With respect to its remaining point regarding the district court's refusal to submit its Requested Question No. 3, Trinity does nothing more than point out that the district court refused to submit the question and complain that it was error. Trinity offers no argument, makes no record references, and cites to no case authority. Accordingly, we conclude that Trinity has failed to adequately brief this sub-issue. *See* Tex. R. App. P. 38.1; *McIntyre v. Wilson*, 50 S.W.3d 674, 682 (Tex. App.—Dallas 2001, pet. denied).

24

We overrule Trinity's fourth issue.

**$25,000 damage award**

Trinity argues in its fifth issue that the jury's damage award of $25,000 is not supported by legally and factually sufficient evidence. As stated previously, the starting point for an evidentiary-sufficiency review of a jury's finding is the question submitted to the jury. *See Osterberg*, 12 S.W.3d at 55; *Golden Eagle*, 116 S.W.3d at 762. Here, Question 6 asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Landowners for their damages, if any, that resulted from Trinity's failure to comply?" The jury was instructed to consider "only the reasonable fee, if any, for the necessary services of the Landowner's attorneys in the suit by the Village of Webberville and all costs and expenses, if any, incurred by the Landowners in connection with that Litigation." Trinity did not object to this damages question or instruction as proposed and submitted. The jury answered, "$25,000." In our evidentiary-sufficiency review of the evidence supporting the jury's finding here, we assess the evidence in light of the instruction given. *See Zimlich*, 29 S.W.3d at 71 (stating that where there is no objection, evidence to support finding based on the instruction should be assessed "in light of" the instruction given); *Larson v. Cook Consultants, Inc*., 690 S.W.2d 567, 568 (Tex.1985) (same); *see also Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007) (party's failure to object to charge and instruction waived any error, meaning that the measure of damages was as provided by the question and instruction given).[13]

---

[13] Also because there was no objection to the question or the charge, we need not address whether the jury's award was based on breach of the indemnity clause or, if on some other breach, whether it was appropriate to award attorney's fees as damages. *See Qwest Commc'ns Int'l, Inc. v. A T & T Corp.*, 114 S.W.3d 15, 32–33 (Tex. App.—Austin 2003), *rev'd in part on other*

25

Stated generally, the Landowners' argument at trial was that its damages as a result of Trinity's breach were the legal fees it had incurred because of Trinity's failure to indemnify it in connection with the Village's lawsuit. In support of its damages, Trinity's lead counsel testified regarding his experience and background, including his work in Travis County, and his firm's billing practices. He testified to his belief that the fees he charged the Landowners were reasonable and necessary, equitable and just, and that they were in line with Travis County and Texas practice. He also testified about his consideration of the various *Andersen* factors, including the time and labor required, the novelty and difficulty of the questions involved, the skill required, the fee customarily charged, the likelihood that the acceptance of the particular employment would have precluded other employment, the amount of money involved and the results obtained, time limitations, the nature and length of the professional relationship with the client, the experience, reputation, and ability of the lawyer or lawyers performing the services, and whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Corp. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

Trinity points out that some of the work that the Landowners were billed for by their attorneys took place before the Landowners were included in the Village's suit against the Landowners. But the Landowners' attorneys testified that this was done in anticipation of suit and also to determine Trinity's position in the matter and further, to prevent the Landowners from being dragged into the lawsuit. For example, they conducted research regarding what ordinances might

---

*grounds*, 167 S.W.3d 324 (Tex. 2005) (per curiam) (holding that attorney's fees ordinarily cannot be recovered as damages); *see also Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007) (party's failure to object to charge and instruction waived any error, meaning that the measure of damages was as provided by the question and instruction given).

26

possibly apply for Trinity's proposed mining in the ETJ. The Landowners' lawyer also testified that he sent letters to Trinity warning them not to start mining without their approval each time Trinity had notified the Landowners that they were about to start mining without that approval. He testified that parts of the costs incurred in these damages were related to his fees for preparing for the temporary injunction hearing and depositions of several witnesses. The Landowners' witness also testified generally about the work necessary in the Village case, including some discovery. He did admit, however, that the Village had not yet pursued the Landowners actively in its case. The evidence included the firm's nine-page invoice documenting all the work done regarding the Village matter (including dates, descriptions of work done, and attorney performing the work) and showing a past amount of $38,879 owing.[14] Under the applicable standards of review, and in light of the instruction given to the jury, we conclude the evidence is both legally and factually sufficient to support the jury's damage finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

We overrule Trinity's fifth issue.

**Trinity's damages**

In its sixth and final issue, Trinity contends that because the evidence in the record conclusively establishes that Trinity paid $705,000 in advance royalties to the Landowners in reliance on the Lease and that Trinity incurred reasonable and necessary attorneys' fees of $196,740.51 in bringing suits against the Landowners, this Court should render judgment for Trinity

---

[14] Trinity argues in its brief that the Landowners invoices show a $71,844.50 write-off in connection with this damage award. Our review of the record, however, shows that write-off to be in connection with the Landowners' attorneys' fee award, which Trinity does not challenge on appeal.

27

or, in the alternative, remand the case to the trial court for reconsideration of Trinity's damages. Trinity offers no legal support for its contention or any citations to authorities, *see* Tex. R. App. P. 38.1 (appellate briefing requirements), but its argument here seems to be a no-evidence challenge to the jury's non-finding on the question of Trinity's damages. *See City of Keller*, 168 S.W.3d at 810 (noting that "no evidence" points may be sustained when the record shows that "the evidence establishes conclusively the opposite of the vital fact" (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361 (1960))).

Regardless of what Trinity's actual argument is, however, what it is asking this Court to do is award it damages when the jury did not or, in the alternative, to send the case back to the trial court to do so. But the jury did not award Trinity damages because the jury charge instructed it not to based on its previous findings. Specifically, the jury was told, in prefaces to Questions 4 and 5—i.e., the questions regarding Trinity's damages—to skip Questions 4 and 5 if the jury had found that Trinity had failed to comply with the Lease first:

> If
>
> (a)     your answer to Question 1 is "Yes" [it was] and your answer to Question 2 is "No" [it was not]
>
> OR
>
> (b)     your answer to Question 3 is "Landowners" [it was Trinity] then answer the following question. Otherwise do not answer the following question.

Trinity did not object to the damages questions and related instructions as proposed and submitted. In fact, when asked by the trial court during the charge conference, Trinity's attorney affirmatively stated that Trinity had no objections to the jury charge. If Trinity believed that the jury charge

28

presented an improper consideration of its damages because it conditioned those damages on findings that only the Landowners had failed to comply with the Lease or that the Landowners had failed to comply first, Trinity was required to timely object and make the trial court aware of its complaint in order to preserve error for appeal. *See* Tex. R. Civ. P. 272, 274; *Equistar*, 240 S.W.3d at 868. Trinity failed to preserve error to challenge the conditional format of the jury charge. Therefore, Trinity may not do so here, and the damages are determined by the questions and instructions given. *See Equistar*, 240 S.W.3d at 868.

We overrule Trinity's sixth issue.

## Conclusion

Having overruled each of Trinity's issues, we affirm the district court's judgment.

_____
Jeff Rose, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: December 31, 2014

RECEIVED

MAR 1 6 2011

Trinity Industries
Corporate Legal Dept.

LAW OFFICES

# McGINNIS, LOCHRIDGE & KILGORE, L.L.P.

600 CONGRESS AVENUE
SUITE 2100
AUSTIN, TEXAS 78701

HOUSTON, TEXAS OFFICE
3200 ONE HOUSTON CENTER
1221 McKINNEY STREET
HOUSTON, TEXAS 77010
(713) 615 - 8500
FAX (713) 615 - 8585

AUSTIN, TEXAS OFFICE
(512) 495 - 6000
FAX (512) 495 - 5093

WRITER'S DIRECT DIAL NUMBER:
(512) 495-6040
dmagee@mcginnislaw.com
Fax: (512) 505-6340

March 14, 2011

Trinity Materials, Inc.
c/o Mr. Dan Richards and Mr. Casey Bell
Richards, Rodriguez & Skeith, L.L.P.
816 Congress Avenue, Suite 1200
Austin, TX 78701-2672

VIA CERTIFIED MAIL
And
VIA FIRST CLASS MAIL

Trinity Materials, Inc.
c/o William A. McWhirter
P.O. Box 5187
Beaumont, Texas 77726

VIA CERTIFIED MAIL
And
VIA FIRST CLASS MAIL

Trinity Materials, Inc.
c/o William A. McWhirter
P.O. Box 373
Ferris, Texas 75125

VIA CERTIFIED MAIL
And
VIA FIRST CLASS MAIL

Trinity Materials, Inc.
c/o James Nixon
2525 Stemmons Freeway
Dallas, Texas 75207

VIA CERTIFIED MAIL
And
VIA FIRST CLASS MAIL

Re:   Sand and Gravel Lease (the "Lease") dated effective as of March 1, 1999 between Carroll Sansom, James Sansom and Robert Coe, as Lessors (the "Lessors"), and Trinity Materials, Inc., as Lessee (the "Lessee"), covering land in Travis County, Texas

Gentlemen:

As you know, this law firm represents Carroll Sansom, James Sansom, and Robert Coe, as Lessors, in connection with the captioned Sand and Gravel Lease. Also, as the Lessors have communicated to you in many prior letters, Trinity Materials, Inc.'s breach of the Lease, as found in the jury verdict in cause No. D-1-GN-09-004105; *Trinity Materials, Inc. v. Carroll Sansom, James Sansom and Robert Coe*; in the 201st Judicial District Court of Travis County, entitles the Lessors to exercise their remedies against Lessee that are available to them under the Lease, at law or in equity, including, without limitation, termination of the Lease.

784

**EXHIBIT 2**   784

Additionally, according to the terms of the Lease, Trinity Materials, Inc.'s royalty payment was due and payable to the Lessors on March 1, 2011, but this payment has not been made. The Lease provides that the Lessee shall be in default under the Lease if Lessee fails to make any payment of royalties when due, where such failure continues for a period of ten (10) days following written notice thereof by or on behalf of Lessors to Lessee. If full payment of said royalty is not paid by Lessee to Lessors within the 10-day time period specified in Paragraph 9(a) of the Lease, this shall constitute an additional default under the Lease and the Lessors will terminate the Lease and pursue such other remedies against Lessee as are available to Lessors at law or in equity.

If you have any questions, please call me.

Sincerely,

Don Magee

DHM:kb